**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ADEKUNLE ADEFEYINTI, (#M32077),     ) | |
|     ) | |
| Petitioner,     ) | |
|     ) | Case No. 15 C 0704 |
| v.     ) | |
|     ) | |
| JOHN VARGA,[1] Warden, Dixon     ) | |
| Correctional Center,     ) | |
|     ) | |
| Respondent.     ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Before the Court is pro se Petitioner Adekunle Adefeyinti's petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254(d)(1). For the following reasons, the Court denies Petitioner's habeas petition and declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

## BACKGROUND

When considering habeas petitions, federal courts must presume the factual findings made by the last state court to decide the case on the merits are correct unless the habeas petitioner rebuts those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller v. Zatecky*, 820 F.3d 275, 280 (7th Cir. 2016). Where Petitioner has not provided clear and convincing evidence to rebut this presumption, the following factual background is based on the Illinois Appellate Court's findings in *People v. Adefeyinti*, No. 1-12-3388, 2014 IL App (1st)

---

[1]     John Varga is the Warden of Dixon Correctional Center where Petitioner is incarcerated. The Court thus substitutes Varga as the named Respondent in this lawsuit. *See Rumsfeld v. Padilla,* 542 U.S. 426, 436, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004); Fed. R. Civ. P. 25(d).

12388-U (1st Dist. July 22, 2014) (unpublished).

## I.     Factual Background

The State charged Petitioner by indictment in connection with a June 12, 2011 incident involving an individual identified as J.C.  At Petitioner's 2012 bench trial, J.C. testified that on June 12, 2011, she was in the vicinity of 47th Street and Cicero Avenue on the south side of Chicago working as a prostitute.  She explained that Petitioner drove up to her in a black limousine, after which they agreed to oral and vaginal sex in exchange for $150.  Further, J.C. testified that Petitioner wanted her to go with him to his house and smoke marijuana, but he had to first switch his car and change out of his work attire at the limousine company where he worked.  Initially, J.C. rode in the front seat of the limousine, but later moved to the back because Petitioner did not want anyone to see her.  After driving on the expressway, Petitioner parked the limousine in a parking lot and climbed into the back seat.  At that time, J.C. asked him for money.  Petitioner showed J.C. his wallet, but did not give her any money.  Petitioner and J.C. then had oral and vaginal sex.  They left the limousine and went to Petitioner's car.

Shortly thereafter, J.C. asked Petitioner if she could smoke in the car.  When Petitioner said no, J.C. exited Petitioner's car and smoked a cigarette near the passenger side of the vehicle. She scratched the license plate number on a pack of matches because she thought the situation was suspicious.  Next, J.C. testified that Petitioner then "tried to beat her to the door" of the car, hit the gas, and pulled away while J.C. was hanging off the side of the car.  She specifically testified that Petitioner "saw me standing right there, he looked right at me and hit the gas and tried to run me into ... a yellow minivan."  After Petitioner fled, J.C. made her way to a Chicago Transit Authority ("CTA") train station and asked a man for a phone so she could call home.

Her next memory was of waking up in the hospital.

At the hospital, J.C. spoke to Chicago Police Detective Joan Burke, who later took J.C. to certain locations in Chicago to trigger her memory, at which time J.C. located Petitioner's limousine at a limousine housing station. Later, J.C. identified Petitioner from a photographic array and a physical lineup at the police station. J.C. also testified about the severity of her injuries, including her facial paralysis, as well as the damage to her clothing and a ring that she had been wearing on the day of the incident.

On cross-examination, J.C. denied meeting Petitioner two or three weeks prior to the June 12, 2011 incident. She also denied that she called Petitioner on the day of the incident to meet him and go to a party. She stated, however, that she could not recall if she told Detective Burke that Petitioner planned on withdrawing $600 from an ATM to split with her. Instead, she testified that Petitioner wanted her "to swipe the card to get some money off the card" and that she would receive $150 while Petitioner would keep the rest of the money. She further stated that Petitioner told her that he shares his ATM card with his wife and that Petitioner's wife did not know he had the card at that time. Petitioner told J.C. that if she swiped the card for him, his wife would think the card was stolen. Furthermore, J.C. recalled Petitioner receiving telephone calls from a female while they were in the car and that Petitioner explained to the female how to fix a television.

Also on cross-examination, J.C. clarified that when Petitioner drove away, her feet were on the running board of the car. She explained that by the time she got on the running board, Petitioner looked at her and then took off. In addition, she testified that as the car was moving, Petitioner was looking at her while she was trying to jump off the running board, but that she

could not move. At that time, she looked up and saw that she was going to run into another vehicle before she blacked out.

Also at Petitioner's 2012 bench trial, Anthony Harris, a CTA Security Officer, testified that on the day of the incident he was working at the CTA Brown Line Stop at 4645 North Damen Avenue on Chicago's north side. At approximately 5:00 a.m., he noticed a woman dressed in torn clothing without shoes, who had blood on her face and hands. The woman approached him to ask if she could use his phone. Harris then testified that the woman, later identified as J.C., was unable to dial the number because something was wrong with her arm. After Harris noticed blood coming from J.C.'s mouth, he called an ambulance. He then noticed a gash on her head "four inches wide and maybe like six or seven inches long."

In addition, Chicago Police Detective Rich Szczepkowicz testified at Petitioner's bench trial that he was assigned to investigate the incident and interview J.C. at the hospital. Detective Szczepkowicz testified that in relation to J.C.'s injuries, "[t]he nurses and doctors speculated it was consistent with either being dragged by a car, run over by a car, [or] perhaps hit by a car." Later, Detective Szczepkowicz received information that led him to the 1800 block of West Leland Avenue near the Damen Stop on the CTA Brown Line. There, residents had noticed blood trails on their property. In addition to blood, an evidence technician found a braid of hair and a broken ring.

Detective Joan Burke testified at trial explaining that J.C. told her that the injuries were caused by a male in his early 30's and described a limousine housing station. A few days later, Detective Burke took J.C. to two limousine housing stations, one of which J.C. immediately identified as the spot where Petitioner had taken her. Once there, J.C. identified the exact

limousine Petitioner drove the day of the incident because it was parked in the same spot and she recognized some damage to its back end. Based on her conversation with J.C., Detective Burke began looking for "a male Jamaican in his 30's, a limousine driver, black suit." The owner of the limousine company, A–1 Limousine, provided Detective Burke with a "run worksheet" from the day of the incident, which lead her to Petitioner.

After Detective Demetrius Kolliopoulos and Detective Burke arrested Petitioner, Detective Burke told Petitioner that she was investigating J.C.'s injuries. At trial, Detective Burke testified that Petitioner then told her that he met a girl around 79th Street and Stony Island Avenue on the south side of Chicago while he was driving a black limousine and that they decided to go to the north side of Chicago. He explained that after changing vehicles to his own car, he became tired and did not want to drive the girl back to the south side of Chicago. Also, Petitioner told Detective Burke that he explained to J.C. that he would give her money to take the train south, but that he was not going to drive her. He further stated that he pulled the car over to an ATM machine and got out of the car, at which time J.C. also got out of the car to have a cigarette. Detective Burke testified that Petitioner also told her that when he returned to his car, "he felt that he was just done with her and he got in, he saw her at his back passenger door and he locked the car doors." He stated that he then "hit the gas and pulled away." Petitioner told Detective Burke that "all he heard was boom."

Kamana Mbekeani, a trauma, surgery, and critical care physician, also testified at Petitioner's 2012 bench trial. More specifically, Dr. Mbekeani testified that J.C.'s head and scalp wounds were life-threatening, and that it is common for people with head injuries to black out. Further, she stated that in cases such as J.C.'s, where her scalp was pulled off, the most

common cause is "the person being dragged at a different speed than the hair itself." Dr. Mbekeani explained that J.C.'s scalp appeared to have been "pulled on an object and the object moved forward and she was dragged with it." When shown pictures of J.C.'s knees and toes, Dr. Mbekeani testified the injuries were consistent with being dragged on the ground. When asked on cross-examination whether J.C. made any indication that sexual activity took place on the night of the incident, Dr. Mbekeani responded that J.C. "was incomprehensible" on the night of the accident and unable to effectively communicate with the medical staff.

After the Circuit Court denied defense counsel's motion for a directed finding under 725 ILCS 5/115-4(k), Petitioner testified at trial. Specifically, he stated that he first met J.C. and her two friends three weeks before the incident at a restaurant on 79th Street and Stony Island Avenue in Chicago. He explained that he gave one of the girls his business card and that J.C. told him her name was Kelly. The other girls were named Dollar and Nicki. Petitioner testified that on the night of the incident, he received a call from Dollar and Nicki, after which Petitioner told them that he got off of work at 3 a.m. He testified that Dollar and Nicki told him that they would call him when he got off work. Further, he testified that after dropping off his customers, he drove back to A–1 Limousine to pick up his own car. One of the girls called him and told him that she was at a party in a motel at Cicero Avenue and Roosevelt Road. Petitioner further testified that he told the girl he could not come to the party, but he could pick her up at a nearby gas station.

When Petitioner arrived at the gas station, J.C. came out to the car and asked to hang out. Petitioner offered his place, but told her he had to first go back to get his chauffeur license from the limousine. He testified that thereafter he pulled up behind the limousine he had been driving

earlier and went to the limousine to get his license. When he came back, J.C. told him that she had never been in a limousine before. Petitioner then allowed her to look inside. He testified that they then went back to his car and drove towards his house. While driving, Petitioner took $700 out of his wallet, which he counted for his rent, while J.C. was by his side. He testified that he then put the money back in his wallet. Petitioner's girlfriend then called him, asking his whereabouts and inquiring when he would be home. Once Petitioner hung up the phone, he told J.C. that they could not go to his house, but that they could meet in the future. Petitioner told J.C. that he would try to drop her off where she could take the train, but J.C. demanded that he take her to 75th Street and Coles Avenue on Chicago's south side. Further, Petitioner testified that his girlfriend kept calling, but that he did not answer the phone. Eventually, he answered the phone and his girlfriend asked him how to operate "Netflix" on the television.

Furthermore, Petitioner testified that J.C. was upset after his conversation with his girlfriend. According to Petitioner, J.C. then pulled out a razor and demanded that he take her to 75th Street and Coles Avenue, but he refused. He then testified that J.C. cut his leather car seat, after which he stopped the car at a gas station and offered to give J.C. money, namely $20, to take the train. He also testified that J.C. told him that she wanted to smoke and got out of the car. Shortly thereafter, Petitioner got out of the car and locked the car door with his remote control. He went to an ATM while J.C. was walking back and forth about 10 or 15 feet away. Petitioner testified that he jumped in his car and drove off. He stated that he heard J.C. hit his car and it sounded like a "boom." Also, Petitioner testified that he did not expect that his girlfriend would be home and that although he intended to have sex with J.C., they never did. Petitioner denied that he and J.C. were ever in the backseat and he further denied knowing that

J.C. was holding on to his car, but testified that he "heard her hit my vehicle in the back, you know. Like somebody hit your car like twice, boom, boom." He testified that he did not know that an accident involving J.C. occurred until three weeks later when he was taken into custody.

On cross-examination, Petitioner stated that J.C. never told him she was a prostitute and that they never agreed to have sex for money. He explained that he went to the ATM to get $20, because he did not want to give her any of the $700 he had on him, which were "all hundreds." Further, he testified that he could not see out of his back window because it was tinted. Also, he clarified that he did not know if J.C. grabbed the rear passenger door, but stated that she did "bang on the passenger side door on the back." When asked whether he saw J.C. at the back door before pulling away, he answered: "No. I heard her knock on the back of the vehicle, boom, boom, twice." Also on cross-examination, Petitioner denied that he told the police that he saw J.C. at the back door. He further testified that he did not stop his vehicle when he heard the two knocks on the back of the vehicle. Last, Petitioner admitted that he did not check on J.C. and he did not call the police after the accident.

## II.    Procedural Background

On August 15, 2012, after Petitioner's bench trial in the Circuit Court of Cook County, Illinois, the Circuit Court judge found Petitioner guilty of the following charges: (1) failure to report an accident after leaving the scene of a motor vehicle accident involving personal injuries; (2) aggravated battery causing great bodily harm; (3) aggravated battery with a deadly weapon other than a firearm; (4) aggravated battery upon a public way; and (5) leaving the scene of a motor vehicle accident involving personal injuries. On October 4, 2012, the Circuit Court judge sentenced Petitioner to concurrent terms of 12 years in prison.

On direct appeal, Petitioner challenged the sufficiency of the evidence for his convictions of leaving the scene of a motor vehicle accident involving personal injuries, failure to report an accident, and aggravated battery. Petitioner also argued that his trial counsel was constitutionally ineffective. On July 22, 2014, the Illinois Appellate Court, First District, affirmed the judgment of the Circuit Court. Petitioner brought the same arguments in his petition for leave to appeal ("PLA"), which the Supreme Court of Illinois denied on November 26, 2014.

## III.     Habeas Petition

On January 22, 2015, Petitioner filed the present pro se petition for a writ of habeas corpus.[2] Construing Petitioner's pro se allegations in his habeas petition liberally, *see Carter v. Duncan,* 819 F.3d 931, 941 (7th Cir. 2016), he asserts: (1) a sufficiency of the evidence claim under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); and (2) ineffective assistance of trial counsel claims under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner has exhausted his habeas claims except for one basis of his ineffective assistance of counsel claim, namely, that trial counsel was ineffective for failing to argue that certain trial witnesses were not credible when moving for a directed finding. Although Petitioner has not exhausted this claim, under 28 U.S.C. § 2254(b)(2), the Court may deny this habeas claim on the merits notwithstanding his failure to exhaust it, as discussed below. *See Bolton v. Akpore,* 730 F.3d 685, 696 (7th Cir. 2013).

---

[2] On March 2, 2016, the Northern District of Illinois Executive Committee reassigned the present habeas matter to this Court.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Court cannot grant habeas relief unless the state court's decision was contrary to, or an unreasonable application of federal law clearly established by the Supreme Court. *See Williams v. Taylor,* 529 U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Corcoran v. Neal,* 783 F.3d 676, 682 (7th Cir. 2015). Clearly established federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to dicta, of the United States Supreme Court. *See White v. Woodall, ___ U.S. ___,* 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014). The Supreme Court has explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams,* 529 U.S. at 405.

Under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 407; *see also White,* 134 S.Ct. at 1702. To be sufficiently unreasonable, the state court's application of federal law must be more than incorrect, it must be "objectively unreasonable." *See Corcoran,* 783 F.3d at 683; *see also Williams,* 529 U.S. at 410 ("*unreasonable* application of federal law is different from an *incorrect* application of federal law") (emphasis in original). To be considered objectively unreasonable, a state court's decision must be "well outside the boundaries of permissible differences of opinion." *Corcoran,* 783 F.3d at 683 (citation omitted). As the Supreme Court teaches, to be objectively unreasonable, the state court ruling must be "so lacking in justification

that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) ("habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.").

## ANALYSIS

### I.      Sufficiency of the Evidence Claim

Petitioner first argues that the State failed to present sufficient evidence to establish his guilt beyond a reasonable doubt for the following convictions: (1) failing to report an accident; (2) leaving the scene of a motor vehicle accident; and (3) aggravated battery. The clearly established Supreme Court law that applies to this habeas claim is set forth in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Jackson* holds that due process is satisfied if – when viewing the evidence in the light most favorable to the prosecution – "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original); *see also Jones v. Butler,* 778 F.3d 575, 581 (7th Cir. 2015) (*Jackson* standard "is a rigorous one"). The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson,* 443 U.S. at 319. Because the Court is considering Petitioner's claim on collateral review, the AEDPA imposes an additional layer to this inquiry, namely, the Court may grant relief only if the Illinois Appellate Court applied the *Jackson* standard unreasonably to the facts of Petitioner's case. *See Jones,* 778 F.3d at 581-82. The Court thus turns to the Illinois Appellate Court's decision in this matter.

Prior to addressing Petitioner's specific arguments concerning his *Jackson* claim, the

Illinois Appellate Court discussed the relevant constitutional parameters for Petitioner's due

process claim. *See People v. Baskerville,* 963 N.E.2d 898, 907, 357 Ill. Dec. 500 (Ill. 2012)

(citing *People v. Davison*, 233 Ill.2d 30, 43, 329 Ill.Dec. 347, 906 N.E.2d 545 (Ill. 2009)

(quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).[3]  In

addressing Petitioner's arguments that the State failed to present sufficient evidence of his guilt

for failing to report an accident and leaving the scene of an accident, the Illinois Appellate Court

stated:

> Defendant argues that the evidence at trial did not show that he knew that
> he was involved in an accident involving another person.  He contends the
> evidence shows that he did not even know about the accident until three weeks
> later.  Defendant acknowledges that J.C.'s testimony indicates that he saw her
> hanging from his car as he drove away, but characterizes her testimony as
> incredible.

*People v. Adefeyinti,* No. 1-12-3388, 2014 WL 3644329, at \*9 (Ill. App. Ct. July 22, 2014)

(unpublished).  The Illinois Appellate Court quoted the statutory language for both offenses,

namely, 625 ILCS 5/11-401(a), (b), highlighting that:

> A conviction under either subsection (a) or (b) of section 11–401 requires
> that the offending motorist had "knowledge that he or she was involved in an
> accident that involved another person."  Circumstantial evidence may be used to
> prove the knowledge requirement.  Additionally, "knowledge that another person
> was involved in the accident may be imputed to a driver from the circumstances
> of the accident."

*Id*. at \*10 (internal citations omitted).

---

[3]  Section 2254(d) does not require the Illinois court to expressly consider federal or Supreme Court law, rather, the court can rely on state court decisions, as long the cases do not contradict federal law as set forth by the Supreme Court. *See Miller v. Zatecky,* 820 F.3d 275, 282 (7th Cir. 2016); *Makiel v. Butler*, 782 F.3d 882, 905 (7th Cir. 2015).

The Illinois Appellate Court – applying the controlling law to the evidence presented at trial – then held:

> Viewing the evidence in the light most favorable to the State, we hold the State proved beyond a reasonable doubt that defendant left the scene of a motor vehicle accident involving personal injury. J.C. testified defendant "tried to beat" her to the car door, looked at her, and then quickly pulled away. She testified defendant "tried to run [her] into ... a minivan." She also testified concerning the injuries she sustained. Detective Burke testified defendant told her that he saw J.C. at his back passenger door, locked the car doors, pulled away, and heard a "boom." Dr. Mbekeani testified J.C.'s injuries were consistent with being dragged on the ground. J.C., Detective Burke, Anthony Harris, and Dr. Mbekeani all testified to the seriousness of J.C.'s injuries. Defendant admitted that he "jumped in" his car before driving off, and heard J.C. hit his vehicle, but denied seeing J.C. hanging onto his car. There was sufficient evidence to sustain defendant's convictions for leaving the scene of a motor vehicle accident involving personal injury. A reasonable trier of fact could have concluded based on the evidence presented that defendant had the requisite knowledge that he was involved in an accident with J.C. and that he then left the scene.
>
> We additionally hold that the evidence at trial, viewed in the light most favorable to the State, was also sufficient to sustain defendant's conviction for failing to report a motor vehicle accident. Defendant admitted at trial that he did not report the accident and testified that he did not find out about the accident until his arrest three weeks later. Defendant's admission that he did not report the accident, in addition to the evidence that he knowingly left the accident scene under section 11–401(a), provided sufficient evidence for his conviction under section 11–401(b) of the Illinois Vehicle Code.
>
> Defendant's argument addressing his convictions under both section 11–401(a) and 11–401(b) of the Illinois Vehicle Code is based on his contention that J.C.'s testimony was incredible. We remind defendant, however, that it is the trier of fact's responsibility to weigh the evidence, resolve conflicting evidence, and make credibility determinations. Accordingly, we hold, after viewing the evidence in the light most favorable to the State, that the evidence was sufficient to sustain defendant's convictions for leaving the scene of a motor vehicle accident and for failing to report the accident.

*Id*. (internal citations omitted).

The Illinois Appellate Court's decision concerning Petitioner's sufficiency of the evidence claims as related to his convictions for leaving the scene of a motor vehicle accident

and for failing to report the accident does not lie "well outside the boundaries of permissible differences of opinion." *Corcoran,* 783 F.3d at 683 (citation omitted). To clarify, the Illinois court applied the proper legal standard pursuant to *Jackson* when viewing the evidence in the light most favorable to the State. Further, the Illinois Appellate Court pointed to the underlying evidence – both direct and circumstantial – that supported these convictions and properly rejected Petitioner's credibility argument. Also, the Illinois court recognized that a conviction under either Section 11–401(a) and 11–401(b) required that the driver knew he was involved in an accident with another person and that this knowledge can be established by circumstantial evidence.

Nevertheless, Petitioner argues that J.C.'s testimony was not credible – pointing to instances where his defense counsel impeached her testimony and the inconsistencies in her trial testimony. Petitioner also highlights other witness testimony that he finds not credible arguing that "their testimony cannot be reconciled with reality." It is well-settled law, however, that in making a determination under *Jackson*, courts do not weigh the evidence or second guess the factfinder's credibility determinations. *See United States v. Mire,* 725 F.3d 665, 678 (7th Cir. 2013). Therefore, Petitioner has failed to show that the Illinois Appellate Court's decision regarding his convictions under 625 ILCS 5/11-401 was objectively unreasonable because it was not "so lacking in justification" that it is "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Next, as to Petitioner's argument that the State failed to present sufficient evidence of guilt as to his aggravated battery conviction, the Illinois Appellate Court explained:

> Defendant argues the State failed to prove the requisite mental state for his aggravated battery causing great bodily harm conviction. Defendant contends he

was not consciously aware that his conduct would cause great bodily harm because he did not know J.C. was hanging on to his car. He acknowledges that J.C. testified he looked at her immediately before driving away, but claims her testimony is incredible.

*People v. Adefeyinti*, 2014 WL 3644329, at *11. The Illinois Appellate Court then set forth the

relevant statutes and supporting case law:

> A battery is committed when a person "intentionally or knowingly without legal justification and by any means ... causes bodily harm to an individual." 720 ILCS 5/12–3. Section 12–4(a) of the Criminal Code of 1961 defines the offense of aggravated battery as when "[a] person ... in committing a battery, intentionally or knowingly causes *great* bodily harm, or permanent disability or disfigurement." (Emphasis added.) 720 ILCS 5/12–4(a). "A person acts knowingly if they are consciously aware that their conduct is practically certain to cause great bodily harm." *People v. Vasquez,* 315 Ill.App.3d 1131, 1133 (2000).

*Id.*

Applying the trial evidence to the Illinois criminal statutes, the Illinois Appellate Court

concluded:

> Viewing the evidence in the light most favorable to the prosecution, we hold the State proved beyond a reasonable doubt that defendant committed aggravated battery causing great bodily harm. J.C. testified that after she got out of defendant's car to smoke a cigarette, defendant "tried to beat [her] to the door." Defendant then looked at her and "hit the gas and pulled off." J.C. testified defendant's windows were down and stressed that defendant saw her prior to pulling away. J.C. further testified defendant "tried to run [her] into ... a yellow minivan." Detective Burke testified defendant told her that he "felt he was done with" J.C., locked the doors, and quickly pulled away. Detective Kolliopoulos testified that defendant told him that he saw J.C. at the back door and that it was her choice to hold onto the car. J.C., Detective Burke, Anthony Harris, and Dr. Mbekeani testified to the seriousness of J.C.'s injuries. Defendant testified that he "jumped" into his car before driving off. He denied seeing J.C. as he drove off. J.C.'s testimony, in addition to the testimony of Detectives Burke and Kolliopoulos, Anthony Harris, and Dr. Mbekeani, provided sufficient evidence for a reasonable trier of fact to conclude defendant knowingly caused great bodily harm to J.C. by driving while she was hanging on to his car. J.C.'s testimony that it seemed as though defendant was trying to run her into another car provided further evidence of defendant's intent to harm her. Defendant again questions J.C.'s credibility. As previously discussed, however, it is trier of fact's

responsibility, and not this court's, to weigh the evidence, resolve conflicting evidence, and make credibility determinations. Accordingly, we hold the record shows sufficient evidence to uphold defendant's conviction for aggravated battery causing great bodily harm.

*Id.* (internal citations omitted).

Again, Petitioner argues that J.C.'s trial testimony was not credible because she gave two versions of the incident. He explains that J.C. misrepresented where she was standing when she was outside of the car before he drove off. Specifically, Petitioner points to impeachment evidence and argues that the Court should disregard J.C.'s trial testimony in relation to Petitioner's knowledge or intent. As discussed above, in analyzing Petitioner's sufficiency of the evidence claim, the Court must defer to the factfinder's credibility determinations, and thus Petitioner's argument is unavailing. *See, e.g., United States v. Resnick,* ___ F.3d ___, 2016 WL 2641860, at *4 (7th Cir. May 4, 2016). Also, the State presented more than just J.C.'s testimony to support this conviction. Indeed, Detective Burke testified that Petitioner told her "he felt that he was just done with her and he got in, he saw her at his back passenger door and he locked the car doors." Detective Kolliopoulos testified that Petitioner told him that he saw J.C. at the car's back door. In addition, Detective Burke, the CTA Security Officer Anthony Harris, and Dr. Mbekeani all testified to the seriousness of J.C.'s injuries. Finally, the Circuit Court found Petitioner's testimony incredible, stating it did not "believe the defendant when he said he didn't see [J.C.]. He knew when he knocked her off the car. And he had the knowledge, in my view, the State proved knowledge in their case." *Adefeyinti*, 2014 WL 3644329, at *7.

In sum, Petitioner's argument regarding J.C.'s credibility does not establish that the Illinois Appellate Court's decision was objectively unreasonable, namely, that it was "so lacking in justification" it was "beyond any possibility for fairminded disagreement," *see Harrington*,

562 U.S. at 103, especially in light of the other testimony presented at trial. *See Stern v. Meisner,* 812 F.3d 606, 610 (7th Cir. 2016) (petitioner "must show complete absence of reasonableness in [] appellate court's decision."). The Court thus denies Petitioner's habeas claims challenging the sufficiency of the evidence under *Jackson*.

## II.    Ineffective Assistance of Counsel Claims

Next, Petitioner argues that his trial counsel was constitutionally ineffective for failing to make certain arguments in support of the motion for a directed finding under 725 ILCS 5/115-4(k). To establish ineffective assistance of trial counsel in violation of the Sixth Amendment, Petitioner must show that (1) his trial attorney's performance "fell below an objective standard of reasonableness," informed by "prevailing professional norms" and (2) "but for counsel's unprofessional errors the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To reflect the wide range of competent legal strategies and to avoid the pitfalls of review in hindsight, [the Court's] review of an attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Groves v. United States,* 755 F.3d 588, 591 (7th Cir. 2014) (citation omitted). To establish prejudice, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding," instead Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Petitioner v. Butts,* 760 F.3d 631, 635 (7th Cir. 2014) (quoting *Strickland,* 466 U.S. at 693-94). If Petitioner fails to make a proper showing under one of the *Strickland* prongs, the Court need not consider the other. *See Strickland,* 466 U.S. at 697 ("a court need not determine whether

counsel's performance was deficient before examining the prejudice suffered by the defendant"); *Groves*, 755 F.3d at 591 (If petitioner "is unable to make a sufficient showing of one of the *Strickland* prongs, we need not consider the other.").  Finally, as the Supreme Court teaches, because the "standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" when "applying the two in tandem, review is 'doubly so.'"  *Harrington,* 562 U.S. at 105 (citations omitted).

Petitioner's first ineffective assistance of counsel claim is based on trial counsel's failure to emphasize during his argument on the motion for a directed finding that the State did not prove that he failed to report the accident within thirty minutes in accordance with 625 ILCS 5/11-401(b).  At the hearing on the motion for a directed finding, defense counsel focused on Petitioner's intent, namely, that he did not intend for the accident to occur.  As to the other charges, defense counsel argued that there was no evidence that Petitioner had any sexual contact with J.C.  The Circuit Court granted Petitioner's motion on the attempted murder charge, but found that the State had met its burden as to the remaining counts of the indictment.

In discussing Petitioner's argument concerning counsel's performance at the hearing on the motion for a directed finding, the Illinois Appellate Court applied the *Strickland* standard as outlined in *People v. Easley*, 192 Ill. 2d 307, 317, 736 N.E.2d 975, 249 Ill.Dec. 537 (Ill. 2000) (citing *Strickland,* 466 U.S. at 687.)  Considering the proper legal framework, the Illinois Appellate Court held that:

> [D]efendant has not satisfied his burden of proving ineffective assistance of counsel because he cannot overcome the presumption that his counsel's actions were a matter of trial strategy.  Initially, we point out that the record shows defendant did mo[ve] for a directed finding and the trial court's ruling on the motion addressed all counts of the indictment.  The trial court granted the motion as to count I, for attempted murder; but denied the motion as to the remaining

18

counts.  Defendant has not challenged the circuit court's ruling on the motion for
a directed finding.  Rather, he bases his argument on how defense counsel orally
argued the motion and how a proper argument may have changed the circuit
court's ruling on the motion for a directed finding.  Our review of the record
shows defense counsel's strategy in this matter was to argue that defendant did
not have sex with J.C. and that he had no knowledge that an accident occurred.  It
follows that if defendant did not know that an accident occurred, then he could
also not subsequently report an accident.  Had the strategy been effective,
defendant would not have been convicted of the counts at issue here as knowledge
is an element the State had to prove to show defendant left the scene of a motor
vehicle accident involving personal injuries, failed to report the accident after
leaving, and aggravated battery.  Defense counsel's focus on defendant's lack of
knowledge of the accident was ultimately unsuccessful.  A failed strategic
decision, however, does not establish ineffective assistance of counsel.
Accordingly, defendant has not overcome the strong presumption that his
counsel's actions in orally arguing the motion for a directed finding were a matter
of trial strategy.

*Adefeyinti*, 2014 WL 3644329, at *13.

The Illinois Appellate Court's decision regarding this ineffective assistance of counsel

claim was objectively reasonable.  *See Harrington*, 562 U.S. at 103; *Corcoran,* 783 F.3d at 683.

As to the *Strickland* performance prong, the Illinois Appellate Court's conclusion that trial

counsel's strategy did not amount to a constitutionally deficient performance is supported by

*Strickland's* teaching that "a court must indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance; that is, the defendant must

overcome the presumption that, under the circumstances, the challenged action 'might be

considered sound trial strategy.'"  *Id.* at 689 (citation omitted).  As the Illinois court explained,

defense counsel's strategy was to focus on Petitioner's lack of knowledge that an accident

occurred and – had the Circuit Court agreed – it would have granted the motion as to all counts

requiring knowledge, not just the failure to report claim.  In addition, although counsel's

arguments in support of the directed finding were not completely successful, the Circuit Court

granted the motion on the attempted murder charge, which vitiates Petitioner's argument that defense counsel's performance was deficient. Moreover, because Petitioner failed to establish that counsel's performance – as a whole – was deficient under the first *Strickland* prong, the Court need not examine the *Strickland* prejudice prong. *See Groves*, 755 F.3d at 591.

Petitioner's second claim under *Strickland* is that his trial counsel provided constitutionally ineffective assistance by failing to challenge the credibility of the State's witnesses, namely, J.C., Detective Burke, and Detective Kolliopoulos, when moving for a directed finding. As discussed above, the Illinois Appellate Court concluded that defense counsel's decision to directly challenge whether the State presented evidence of Petitioner's knowledge was a sound trial strategy under *Strickland*. Petitioner also fails to explain how defense counsel's failure to challenge the credibility of these witnesses when moving for a directed finding "fell below an objective standard of reasonableness," informed by "prevailing professional norms." *See Strickland* 466 U.S. at 668, 688.

Also, in relation to his argument concerning the State's credibility of witnesses, Petitioner has not argued, let alone established that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," as required to show prejudice. *See Strickland,* 466 U.S. at 694. Consequently, Petitioner has failed to show that the Illinois Appellate Court's decision was objectively unreasonable. *See Harrington*, 562 U.S. at 103; *Stern,* 812 F.3d at 610. Therefore, the Court denies Petitioner's ineffective assistance of counsel claim in regard to counsel's decision not to challenge the witnesses' credibility when moving for a directed finding under 725 ILCS 5/115-4(k).

On a final note, for the first time in his reply brief filed on June 9, 2015, Petitioner argues that his defense counsel was constitutionally ineffective for failing to "build a defense when given the opportunity for rebuttal [and] Petitioner's counsel declined" and "failed to impeach state witness [J.C.] during cross-examination." Not only is it well-established that arguments made for the first time in a reply brief are waived, Petitioner has failed to develop these bare-boned statements. *See United States v. Collins,* 796 F.3d 829, 836 (7th Cir. 2015) (the "[c]ourt has long warned that perfunctory and undeveloped arguments are deemed waived."); *Darif v. Holder,* 739 F.3d 329, 336-37 (7th Cir. 2014) ("[A]rguments raised for the first time in a reply brief are waived."). Moreover, in his habeas filings, Petitioner admits that defense counsel consistently impeached J.C. with her inconsistent statements. Last, Petitioner fails to argue how he was prejudiced by counsel's alleged deficient performance. As such, these newly-made arguments fail.

## II.    Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Petitioner a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) in the present ruling. *See Gonzalez v. Thaler,* ___ U.S. ___, 132 S.Ct. 641, 649 n.5, 181 L.Ed.2d 619 (2012).

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, rather, he must first request a certificate of appealability. *See Miller-El v. Cockrell,* 537 U.S. 322, 335, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); *Flores-Ramirez v. Foster,* 811 F.3d 861, 865 (7th Cir. 2016). A habeas petitioner is entitled to a certificate of

appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El,* 537 U.S. at 336; 28 U.S.C. § 2253(c)(2).  Under this standard, Petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Miller-El,* 537 U.S. at 336 (quoting *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

Here, Petitioner has not established that reasonable jurists would debate that the Court should have resolved his ineffective assistance of trial counsel claims in a different manner, especially because there is a strong presumption that trial counsel's performance falls within the wide range of reasonable professional assistance.  *See Groves,* 755 F.3d at 591.  Further, Petitioner has not demonstrated that reasonable jurists would debate that the Court should have resolved his sufficiency of the evidence claims under *Jackson* in a different manner.  As such, the Court declines to certify any issues for appeal.  *See* 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For these reasons, the Court denies Petitioner's petition for a writ of habeas corpus and declines to certify any issues for appeal.  *See* 28 U.S.C. §§ 2253(c)(2), 2254(d).

**Dated:**  July 19, 2016

ENTERED

**AMY J. ST. EVE**
**United States District Judge**